**Baker & Hostetler LLP**

45 Rockefeller
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Keith R. Murphy
Marc Skapof
Elizabeth A. Scully

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-_____ (BRL) |
| Plaintiff, | |
| v. | |
| CARDINAL MANAGEMENT, INC., AND DAKOTA GLOBAL INVESTMENTS, LTD., | |
| Defendants. | |

**<u>COMPLAINT</u>**

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard

L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act,

15 U.S.C. §§ 78aaa, *et seq*. ("SIPA")[1] and the substantively consolidated estate of Bernard L.

Madoff, individually ("Madoff"), by and through his undersigned counsel, for his Complaint,

states as follows:

## NATURE OF PROCEEDING

1.      This adversary proceeding arises from Cardinal Management, Inc.'s ("Cardinal

Management") and Dakota Global Investments, Ltd.'s ("Dakota Global") (collectively, the

"Defendants") receipt of other people's money because of their participation in the massive Ponzi

scheme masterminded by Madoff and enabled by others.  Over the course of the scheme, there

were more than 8,000 client accounts at BLMIS.  In early December 2008, BLMIS generated

client account statements for its approximately 4,900 open client accounts at BLMIS.  When

added together, these statements purportedly show that clients of BLMIS had approximately $65

billion invested with BLMIS.  In reality, BLMIS had assets on hand worth a small fraction of that

amount.  On March 12, 2009, Madoff admitted to the fraudulent scheme and pled guilty to 11

felony counts, and was sentenced on June 29, 2009 to 150 years in prison.  Cardinal Management

and Dakota Global ignored glaring red flags and failed to meet basic due diligence standards in

connection with Cardinal Management's investments into BLMIS.   Cardinal Management and

Dakota Global received avoidable transfers, directly and/or indirectly from BLMIS, under

circumstances that did or should have put them on inquiry notice that Madoff and BLMIS were a

fraud.

---

[1]  For convenience, subsequent references to SIPA shall omit "15 U.S.C."

2.      Within the two-year period prior to the Filing Date of December 11, 2008, Cardinal Management withdrew or received the benefit of $28,789,737 from BLMIS, $24,099,820 of which was withdrawn or received in the 90-day period prior to the Filing Date of December 11, 2008.  Cardinal Management in turn transferred at least $24 million of the money it received from BLMIS during the 90-day preference period to Dakota Global.  As a result of these transfers, Cardinal Management and Dakota Global are in a more favorable position than other customers of BLMIS.  This action is brought to avoid and recover the avoidable transfers of "Customer Property," as defined in the SIPA statute.[2]

3.      The Trustee brings this adversary proceeding pursuant to his statutory authority under SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3), the United States Bankruptcy Code (the "Bankruptcy Code") §§105(a), 502(d), 510(c), 544, 547, 548(a), 550(a), and 551, the New York Fraudulent Conveyance Act (N.Y. Debt & Cred. ("DCL") §270 *et seq*. (McKinney 2001)), and other applicable law, for avoidance of preferential and fraudulent transfers, recovery of said transfers from initial and subsequent transferees, and from parties for whose benefit the transfers were made, disallowance of claims, and equitable subordination.  The Trustee seeks, among other things, to set aside such transfers, recover and preserve the Customer Property for the benefit of the estate.

## JURISDICTION AND VENUE

4.      This is an adversary proceeding commenced before the same Court before which the main underlying SIPA proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding"), is pending.

---

[2]  SIPA § 78*lll*(4) defines "Customer Property" as "cash and securities … at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted."

The SIPA Proceeding originally was brought in the United States District Court for the Southern

District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment*

*Securities LLC, et al.*, No. 08 CV 10791 (the "District Court Proceeding") and was removed to

this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b)

and SIPA §§ 78eee(b)(2)(A), (b)(4).

5.      This case is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (F),

(H), and (O).

6.      Venue in this district is proper under 28 U.S.C. § 1409.

**<u>THE TRUSTEE AND STANDING</u>**

7.      On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents

for violation of the criminal securities laws, including, *inter alia*, securities fraud, investment

adviser fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange

Commission ("SEC") filed a complaint in the District Court which commenced the District Court

Proceeding against Madoff and BLMIS.  The District Court Proceeding remains pending.  The

SEC complaint alleged that Madoff and BLMIS engaged in fraud through the investment adviser

activities of BLMIS.

8.      On December 12, 2008, The Honorable Louis L. Stanton of the District Court

entered an order, appointing Lee S. Richards, Esq. (the "Receiver") as receiver for the assets of

BLMIS.

9.      On December 15, 2008, pursuant to SIPA § 78eee(a)(4)(A), the SEC consented to

a combination of its own action with an application of SIPC.  Thereafter, pursuant to SIPA §

78eee(a)(4)(B), SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS

was not able to meet its obligations to securities customers as they came due and, accordingly, its

customers needed the protections afforded by SIPA.

    10.    Also on December 15, 2008, Judge Stanton granted the SIPC application and

entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

    a.    Appointed the Trustee for the liquidation of the business of BLMIS
pursuant to SIPA § 78eee(b)(3);

    b.    Appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to
SIPA § 78eee(b)(3); and

    c.    Removed the case to this Bankruptcy Court pursuant to SIPA §
78eee(b)(4).

By this Protective Decree, the Receiver was removed as Receiver for BLMIS.

    11.    By Orders dated December 23, 2008 and February 4, 2009, respectively, the

Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested

person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of

BLMIS.

    12.    At a Plea Hearing (the "Plea Hearing") on March 12, 2009, in the case captioned

*United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pled guilty to an eleven-count

criminal information filed against him by the United States Attorney's Office for the Southern

District of New York. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme

through the investment advisory side of [BLMIS]." Plea Allocution of Bernard L. Madoff at 23,

*United States v. Madoff*, No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50).

Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong,

indeed criminal." *Id.* Madoff was sentenced on June 29, 2009 to 150 years in prison.

    13.    On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to

participating and conspiring to perpetuate the Ponzi scheme. At a Plea Hearing on August 11,

2009 in the case entitled *United States v. DiPascali*, Case No. 09-CR-764(RJS), DiPascali pled

guilty to a ten-count criminal information. Among other things, DiPascali admitted that the Ponzi

scheme had begun at BLMIS at least as early as the 1980's. Plea Allocution of Frank DiPascali

at 46, *United States v. DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009) (Docket No.

11).

14.     As the Trustee appointed under SIPA, the Trustee is charged with recovering and

paying out Customer Property to BLMIS's customers, assessing claims, and liquidating any other

assets of the firm for the benefit of the estate and its creditors. The Trustee is in the process of

marshalling BLMIS's assets, and the liquidation of BLMIS's assets is well underway. However,

such assets will not be sufficient to reimburse the customers of BLMIS for the billions of dollars

that they invested with BLMIS over the years. Consequently, the Trustee must use his authority

under SIPA and the Bankruptcy Code to pursue recovery from customers who received

preferences and fraudulent transfers to the detriment of other customers whose money was

consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be

unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

15.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy

trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant

to SIPA § 78fff-1(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy

Code apply to this case, pursuant to SIPA § 78fff(1).

16.     Pursuant to SIPA §§ 78fff(b) and 78lll(7)(B), the Filing Date is deemed to be the

date of the filing of the petition within the meanings of Bankruptcy Code §§ 547 and 548 and the

date of commencement of the case within the meaning of Bankruptcy Code § 544.

17.     The Trustee has standing to bring these claims pursuant to SIPA § 78fff-1(a) and

the Bankruptcy Code, including §§ 323(b) and 704(a)(1), because, among other reasons:

    a.    the Defendants received "Customer Property" as defined in SIPA § 78*lll*(4);

    b.    BLMIS incurred losses as a result of the claims set forth herein;

    c.    BLMIS's customers were injured as a result of the conduct detailed herein;

    d.    SIPC has not reimbursed, and statutorily cannot fully reimburse, all customers for all of their losses;

    e.    the Trustee will not be able to fully satisfy all claims;

    f.    the Trustee, as bailee of Customer Property, can sue on behalf of the customer bailors;

    g.    the Trustee is the assignee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding (such claim-filing customers, collectively, "Accountholders").  As of the date hereof, the Trustee has received multiple express unconditional assignments of the applicable Accountholders' causes of action, which actions could have been asserted against Defendants.  As assignee, the Trustee stands in the shoes of persons who have suffered injury-in-fact and a distinct and palpable loss for which the Trustee is entitled to reimbursement in the form of monetary damages;

    h.    SIPC is the subrogee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding.  SIPC has expressly conferred upon the Trustee enforcement of its rights of subrogation with respect to payments it has made and is making to customers of BLMIS from SIPC funds; and

    i.    the Trustee has the power and authority to avoid and recover transfers pursuant to Bankruptcy Code §§ 544, 547, 548, 550(a) and 551, and SIPA § 78fff-2(c)(3).

## DEFENDANTS

18.     Defendant Cardinal Management is an international business company organized under the laws of St. Lucia, with a principal place of business at 7 Mongiraud Street, Castries, British West Indies, St. Lucia.

19.     Defendant Dakota Global is a private mutual fund organized under the laws of the British Virgin Islands.  Dakota Global is currently in liquidation.

20.     At all times relevant hereto, Cardinal Management was a direct client of the IA Business, and Dakota Global was a mutual fund that invested in BLMIS through Cardinal Management.

21.     In addition, Cardinal Management has filed three customer claims in the SIPA Proceeding seeking to recover funds it allegedly lost on its investments in BLMIS, whereby it has submitted to the jurisdiction of this Court.

22.     This Court has personal jurisdiction over all the Defendants captioned herein pursuant to N.Y. C.P.L.R. §§ 301 and 302 and Bankruptcy Rule 7004.  All Defendants have maintained minimum contacts with New York in connection with the claims alleged herein. Cardinal Management has intentionally taken advantage of the benefits of conducting transactions in the State of New York by, among other things, holding an account with BLMIS in New York, entering into agreements in New York, delivering agreements to BLMIS headquarters in New York, communicating regularly with persons in New York, sending/receiving funds to/from BLMIS in New York, deriving significant revenue from New York, utilizing New York banks, and filing customer claims in the Bankruptcy Court seeking to recover funds allegedly lost through BLMIS.  Dakota Global invested in BLMIS through Cardinal Management, and also thereby intentionally took advantage of the benefits of conducting transactions in the State of

New York, including deriving significant revenue from its investments in Cardinal

Management's accounts with BLMIS in New York.

## THE PONZI SCHEME

23.     BLMIS was founded in 1959 by Madoff and, for most of its existence, operated

from its principal place of business at 885 Third Avenue, New York, New York.  Madoff, as

founder, chairman, chief executive officer, and sole owner, operated BLMIS together with

several of his friends and family members.  BLMIS was registered with the SEC as a securities

broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, SIPA § 78o(b).  By

virtue of that registration, BLMIS is a member of SIPC.  BLMIS had three business units: the

Investment Advisory ("IA") Business, market-making, and proprietary trading.

24.     Outwardly, Madoff ascribed the consistent success of the IA Business to his so-

called "split-strike conversion" strategy ("SSC Strategy").  Pursuant to that strategy, Madoff

purported to invest BLMIS customers' funds in a basket of common stocks within the S&P 100

Index—a collection of the 100 largest publicly traded companies.  Madoff claimed that his basket

of stocks would mimic the movement of the S&P 100 Index.  He also asserted that he would

carefully time purchases and sales to maximize value, and correspondingly, BLMIS customers'

funds would, intermittently, be out of the equity markets.  While out of the market, those funds

were purportedly invested in United States Treasury bills or in mutual funds holding Treasury

bills.  The second part of the SSC Strategy was the hedge of Madoff's stock purchases with S&P

100 Index option contracts.  Those option contracts functioned as a "collar," limiting both the

potential gains and the potential losses.  Madoff purported to use proceeds from the sale of S&P

100 Index call options to finance the cost of purchasing S&P 100 Index put options.  Madoff also

told IA Business customers, including the Defendants, that he would enter and exit the market between six and ten times each year.

25.    BLMIS's IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts. The securities purchases and sales shown in such account statements never occurred and the profits reported were entirely fictitious. At the Plea Hearing, Madoff admitted that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts. In fact, there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the SSC Strategy. Madoff's SSC Strategy was entirely fictitious.

26.    At times prior to his arrest, Madoff generally assured customers and regulators that he purchased and sold the put and call options over-the-counter ("OTC") rather than through an exchange. Yet, like the underlying securities, the Trustee has yet to uncover any evidence that Madoff ever purchased or sold any of the options described in customer statements. The Options Clearing Corporation, which clears all option contracts based upon the stocks of S&P 100 companies, has no record of the IA Business having bought or sold any exchange-listed options on behalf of any of IA Business customers.

27.    For all periods relevant hereto, the IA Business was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options. Rather, BLMIS used its IA Business customers' deposits to pay redemptions by other customers, and to make other transfers, which are avoidable by the Trustee. Many of these transfers were to enrich Madoff, his associates, and his family.

28.    The falsified monthly account statements reported that the accounts of IA Business customers had made substantial gains, but, in reality, because it was a Ponzi scheme, BLMIS did

not have the funds to pay investors on account of their new investments.  BLMIS was only able

to survive for as long as it did by using the stolen principal invested by some customers to pay

other customers.

29.    The payments to investors constituted an intentional misrepresentation of fact

regarding the underlying accounts and were an integral and essential part of the fraud. The

payments were necessary to validate the false account statements and were made to avoid

detection of the fraud, to retain existing investors, and to lure other investors into the Ponzi

scheme.

30.    At all times relevant hereto, the liabilities of BLMIS were billions of dollars

greater than its assets.  BLMIS was insolvent in that: (i) its assets were worth less than the value

of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the

transfers, BLMIS was left with insufficient capital.

31.    Madoff's scheme continued until December 2008, when the requests for

withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the

Ponzi scheme.

### CARDINAL MANAGEMENT'S INVESTMENTS WITH BLMIS

32.    According to BLMIS's records, Cardinal Management maintained an account with

BLMIS that was designated account number 1FR119, as set forth on Exhibit A (the "Account").

The Account was opened on or about July 1, 2005, under the signatures of Gabriel Charbonnier

and Christian Brustlein.  Messrs. Charbonnier and Brustlein, on behalf of Cardinal Management,

executed a Customer Agreement, an Option Agreement, and/or a Trading Authorization Limited

to Purchases and Sales of Securities and Options (collectively, the "Account Agreements"), and

delivered such documents to BLMIS at BLMIS's headquarters at 885 Third Avenue, New York, New York.

33.     The Account Agreements were to be performed in New York, New York through securities trading activities that would take place in New York, New York.  The Account was held in New York, New York, and Cardinal Management sent funds to BLMIS's account at JPMorgan Chase & Co. in New York, New York, Account # xxxxxxxxxxx1703 (the "703 Account"), for application to the Account and the purported conducting of trading activities.

34.     Messrs. Charbonnier and Brustlein, who are both residents of Switzerland, were the individuals who were authorized to act for Cardinal Management and open its account with BLMIS.

35.     Christian Brustlein directed all of the Transfers at issue in this matter to be made and redeemed from the 703 Account.

36.     Gabriel Charbonnier is the President and Christian Brustlein is the Vice President of T.H.E. Family Office, S.A., a Swiss based investment company.

37.     Messrs. Charbonnier and Brustlein, along with their respective wives, are the ultimate beneficiaries of and the individuals who control Cardinal Management.  Cardinal Management has no separate investment manager or administrator.  As Messrs. Charbonnier and Brustlein represented to Madoff when they forwarded Cardinal Management's executed opening Account Agreements, Cardinal Management is owned by Fidelity International Private Foundation ("Fidelity"), a foundation incorporated under the laws of the Netherlands.  The sole beneficiaries of Fidelity are Christian Brustlein, along with his wife Dominique Brustlein-Bobst and Gabriel Charbonnier, along with his wife, Nathalie Charbonnier-Davies.

38.     Gabriel Charbonnier and his wife, Nathalie Charbonnier-Davies, are both experienced, sophisticated asset management professionals.  Since 1994, Gabriel Charbonnier has been an independent financial consultant.  Prior to that time he was managing director of Citco Financial Services Lausanne SA.  He has also served as a private wealth fortune manager and vice chairman of Pictet Bank and Trust in the Bahamas, and worked in the audit department of Arthur Anderson SA in Geneva.  Nathalie Charbonnier-Davies joined Banque Syz & Co, S.A. ("Banque Syz") from HSBC Republic in September 2003 to launch its hedge fund advisory group.  Since March 16, 2004, she has been a vice director of Banque Syz.

39.     Messrs. Charbonnier and Brustlein also created and formed Dakota Global, which they marketed as a feeder fund into BLMIS.  Dakota Global invested in BLMIS through Cardinal Management.  Again, Dakota Global was operated and managed by Messrs. Charbonnier and Brustlein.  Dakota Global's investment manager, Rainbow Capital Management, was also owned by Messrs. Charbonnier and Brustlein.

## DEFENDANTS WERE ON INQUIRY NOTICE OF RED FLAGS CONCERNING BLMIS'S PERFORMANCE

40.     Defendants Cardinal Management and Dakota Global knew or should have known that that Cardinal Management's purported account activity was inconsistent with legitimate trading activity and credible returns.

41.     Defendants were operated by sophisticated, experienced investment professionals who, upon information and belief, accepted fees from their customers based on purported assets under management and/or fund performance in consideration for the diligence they were expected to exercise in selecting and monitoring investment managers such as Madoff.

A.     **Significant Indicia Of Fraud Was Apparent From The Information Received by
Cardinal Management and Dakota Global**

42.     Upon information and belief, Cardinal Management and Dakota Global knew of,

and/or were presented with significant red flags from multiple sources, including without

limitation:  financial and quantifiable data; performance and trade information; publicly available

market information; and publicly stated industry concerns about Madoff.  Upon information and

belief, the totality of the information known and available to the Defendants placed them on

inquiry notice of many red flags indicating fraud.

43.     The account statements and trade confirmations Cardinal Management received

from BLMIS showed possible fraud.  This information was also known to Dakota Global,

because the individuals operating and managing Cardinal Management and Dakota Global were

one and the same.  Defendants knew or should have known that:  (i) there were not enough

options for Madoff's trading strategy; (ii) the options trade confirmations contained significant

abnormalities; (iii) the settlement period reflected on trade confirmations did not conform to

standard market convention; (iv) Madoff was supposedly executing hundreds of millions of

dollars in options trades on behalf of Cardinal Management with anonymous counterparties; (v)

BLMIS purported to trade securities on behalf of Cardinal Management at prices outside the

available daily price range; (vi) Cardinal Management's consistent returns purportedly achieved

by BLMIS using the SSC strategy in the face of declining S&P 100 markets made no sense; (vii)

Madoff demonstrated purported trades inconsistent with his SSC Strategy; (viii) Madoff's ability

to consistently buy and sell above the daily midpoint was statistically impossible and thus, a

further indicia of fraud; (ix) despite BLMIS having billions in purported trading volumes, no

impact was ever seen on the market or the purported price of securities; (x) there was a lack of an

independent custodian for customer assets; (xi) despite being a pioneer of electronic record-

keeping, Madoff provided customers with paper trading confirmations days later; (xii) Madoff's auditor was not competent or capable of performing audits of BLMIS's trading with billions under management; (xiii) Madoff did not charge standard asset management fees; and (xiv) Cardinal Management at times had a negative cash balance with BLMIS.

44.     Numerous indicia of fraud concerning BLMIS gave Cardinal Management and Dakota Global actual and/or constructive knowledge of BLMIS' fraud.  These indicia of fraud, and Cardinal Management and Dakota Global's willful and deliberate decision to continue investing, directly and indirectly, with BLMIS despite them, demonstrates a motive and opportunity to commit fraud, and/or conscious misbehavior or recklessness amounting to fraudulent intent.  Given the Defendants' actual or constructive knowledge of these indicia of fraud, the Defendants were neither innocent nor good faith investors.

1.     **BLMIS's Purported Options Trading Demonstrated Glaring Indicia of Fraud**

a.     **There Were Not Enough Options For The SSC Strategy**

45.     Upon information and belief, Cardinal Management's trade confirmations demonstrated that Madoff was purportedly engaging in impossible stock option transactions.  An essential element of the SSC Strategy was the purchase and sale of S&P 100 Index ("OEX") options to hedge the investment in a representative basket of 35-40 stocks whose performance correlated with the S&P 100.  Madoff originally claimed to execute these options on the Chicago Board Options Exchange ("CBOE").  The implementation of Madoff's SSC Strategy required the continuous execution of large numbers of OEX options.  However, even using conservative estimates of Madoff's assets under management, there were not enough options in the world, let alone the CBOE index, to hedge a fund the size of Madoff's IA Business.

46.     On many occasions, throughout Cardinal Management's investment with BLMIS, the options volume BLMIS reported to have engaged in on behalf of Cardinal Management exceeded the total number of OEX options traded on the CBOE.  As an example, just two weeks before Cardinal Management withdrew $4,000,000 from BLMIS, on August 15, 2008, BLMIS purportedly sold on Cardinal Management's behalf a total of 1,124 S&P 100 put options (with an August 16, 2008 expiration date and a strike price of 575), when the total volume traded on the CBOE for all such contracts that day was 31—exceeding the total daily volume of options traded by three thousand five hundred twenty-six percent (3,526%).

47.     Upon information and belief, during the course of Cardinal Management's investment with BLMIS, more than thirty percent (30%) of all options transaction BLMIS purported to engage in on behalf of Cardinal Management exceeded the daily market volume of options traded for those contracts on the CBOE.  Defendants knew or should have known that the option trading volumes reported by BLMIS were impossible and a huge red flag of possible fraud.

48.     Cardinal Management and Dakota Global did not perform independent and reasonable due diligence or make further inquiry regarding the impossible options volumes BLMIS purported to trade for the Funds' accounts.  Defendants failed to conduct an adequate investigation, or made no investigation at all regarding the purported option transactions, choosing instead to remain willfully ignorant.

### b.     The Options Trade Confirmations Did Not Identify Counterparties and Contained CUSIP Numbers

49.     When questioned about the availability of sufficient exchange traded options for the SSC Strategy, Madoff often responded that he traded in the over-the-counter ("OTC") market, rather than the CBOE.  This claim should have raised great suspicion, requiring independent,

meaningful, and reasonable due diligence. Upon information and belief, Cardinal Management's options trade confirmations contained other telling anomalies that should have prompted the Defendants to inquire further about the legitimacy of these transactions. First, in the OTC market the counterparty may expressly be identified on the confirmation statement. However, upon information and belief, the options trade confirmations received by Cardinal Management from BLMIS never identified the counterparty. Second, options traded on the CBOE have an identifier known as a "CUSIP" number, which allows traders to quickly access electronic information regarding a particular option contract. OTC options, however, are not assigned a CUSIP number. Furthermore, the options that BLMIS purportedly traded expired on the same date and had the same exercise pricing as the standardized CBOE options and therefore appear to be the identical option traded on the CBOE. Additionally, the options represented on the trade confirmations are a CBOE licensed product and should not trade in an OTC environment. Because of these trade confirmation abnormalities, the Defendants should have immediately known that Madoff's purported options trades could not have been purchased on the OTC market either.

<strong>c.      The Settlement Period Reflected On The Trade Confirmations Did Not Conform To Standard Market Convention</strong>

50.      The settlement period reflected on Cardinal Management's options trade confirmations in many instances were contrary to the standard market convention. This fact should have also prompted the Defendants to independently and reasonably inquire about the legitimacy of these purported transactions. The standard market convention for settlement of options transactions is within one day of the option trade date (referred to in the industry as "T+1"). However, in approximately seventy-five percent (75%) of the options transactions BLMIS purported to execute on behalf of Cardinal Management, the settlement date occurred well outside the standard market convention, with the settlement date not occurring in the

majority of the instances until as late as three days after the option trade date.

**2.      If The Trading Purportedly Done By BLMIS Had Occurred, Cardinal Management Would Have Been Exposed To Hundreds Of Millions of Dollars In Option Contracts With Unidentified Counterparties**

51.    Trading OTC options would have required Madoff to enter into private contracts with willing counterparties.  Madoff would have entered those contracts as an agent on behalf of BLMIS's customers, such as Cardinal Management.  Had those counterparties defaulted on those contracts, Madoff's customers, including Cardinal Management, would have been exposed to gigantic losses.  Thus, it should have been critical to both Cardinal Management and Dakota Global that the counterparties implicit in Madoff's SSC Strategy be reliable, well-capitalized and liquid.  If a counterparty failed to perform, it was Cardinal Management, and in turn its investor Dakota Global, and not Madoff, who was exposed.

52.    Madoff refused to identify the counterparties, claiming that he had to prevent his customers from dealing directly with the counterparties, and that the names of parties were proprietary.  Defendants never knew the identities of these options counterparties because there were none.  Cardinal Management believed that it had hundreds of millions of dollars in counterparty exposure, and yet it had no idea whom it would pursue in the event of a default.  In light of this significant risk, Defendants should have performed an independent inquiry into the identity of the counterparties to these transactions, but upon information and belief, they did not.

**3.      Trades Were Purportedly Being Executed Outside The Daily Price Range**

53.    Cardinal Management's monthly account statements received from BLMIS, at times, reflected securities trades purchased or sold on their behalf that were allegedly executed at prices outside the daily range of prices for such securities traded in the market on the days in question.  Cardinal Management received purported trade confirmations from BLMIS matching the securities transactions reported on the monthly account statements which, if verified with the

prices in the market on the trade dates in question, would have revealed that the trades could not

have been executed at the prices reported.  Had the Defendants simply compared the trade

confirmations with published price data, it would have been apparent that those trades could not

have occurred as Madoff claimed.

**4.    BLMIS's Rates Of Return Were Suspiciously Positive In The Face of Declining S&P 100 Markets**

54.    Upon information and belief, Defendants understood that Madoff's trading

strategy was designed to be highly correlated to the S&P 100.  Based on statements Cardinal

Management received from BLMIS, Defendants also knew that this purported correlation did not

in fact occur.

55.    Both Cardinal Management and BLMIS were effectively immune from any

number of market catastrophes, enjoying suspiciously consistent rates of return at times when the

S&P 100 was experiencing dramatic financial crises.  For example, in the face of the recession

and housing crisis of 2008, Cardinal experienced nearly double-digit returns, outperforming the

S&P 100 by 46 percent (46%), when the S&P 100 suffered double-digit losses.

56.    Further, Cardinal Management experienced positive returns for every month, but

one, during the 41-month period from its initial investment with BLMIS in July 2005 through its

last account statement in November 2008.   The S&P 100 index had 17 months of negative

returns over the same period.  Such consistent returns are not correlated at all with the historical

and at times negative fluctuations of the S&P 100 Index, on which the IA Business' trading

activity was supposedly based.  These performance results should have raised a red flag to the

Defendants that Madoff's strategy was not what it appeared to be.

57.    The Defendants willfully turned a blind eye to the fact that this strategy, dependent in large part on how stocks in the S&P 100 performed, continued to yield positive returns without any correlation to the S&P 100.

**5.    Madoff Demonstrated Purported Trades Inconsistent With His SSC Strategy**

58.    Upon information and belief, on a number of separate occasions, Cardinal Management's account statements received from BLMIS purported to show gains on behalf of Cardinal Management resulting from transactions inconsistent with Madoff's supposed SSC Strategy.  Certain of these transactions involved short term option trading that resulted in substantial gains for Cardinal Management.  For example, in 2008, the Cardinal Management account participated in two of these trades generating more than $1.4 million in gains.  These transactions represent approximately 11% of the total return earned in 2008.  These gains were achieved by speculating in the options market, a strategy which contradicts the nature of the SSC Strategy and should have raised a red flag for sophisticated investors such as Cardinal Management and Dakota Global.

59.    Additionally, in certain instances Madoff purported to sell a specific stock or stocks from a basket before the rest of the basket was liquidated.  Not only was the early sell from a basket inconsistent with the SSC Strategy, but when these positions were liquidated, the collar for the basket was not adjusted.  These trades contradicted Madoff's SSC Strategy and should have raised a red flag for Cardinal Management and Dakota Global.

**6.    BLMIS's Ability To Consistently Buy Below And Sell Above The Daily Midpoint**

60.    BLMIS's purported trades for Cardinal Management almost always appeared to occur at precisely the right time of day.  An analysis of Cardinal Management's trade data reveals that 81% of the time, BLMIS was purporting to purchase stocks for Cardinal Management below

the daily midpoint price, and that 69% of the time, BLMIS was purporting to sell stocks for

Cardinal Management at a price above the daily midpoint price.  It would have been statistically

impossible for Madoff to achieve such percentages buying and selling stocks for all of his IA

business customers once a day.  Even more so, if Madoff were executing the SSC strategy by

engaging in "time slicing" within a given day, as he claimed, since such a practice would have

resulted in BLMIS's trades being closer to the daily midpoint price.

61.     Madoff's degree of success was even vastly more improbable given the enormous

volumes BLMIS appeared to trade.  Sophisticated investors, such as Defendants, would know

that any request to sell such a large volume of stock would have driven the price down, making it

impossible for Madoff to so frequently sell above the daily midpoint.

### 7.     Despite Exorbitant Trading Volume There Was Never Any Impact On The Market

62.     Madoff told customers such as Cardinal Management that the SSC Strategy

involved moving all assets into the market over the span of a few days, and then selling off all of

those securities over the same span of time.  Upon information and belief, prior to registering as

an investment adviser, feeder funds such as Cardinal Management and Dakota Global understood

Madoff to have billions under his management.  When he registered as an investment adviser in

August 2006, Madoff represented in BLMIS's ADV Form filed with the SEC that BLMIS had

approximately $11.7 billion of assets under management at the end of July 2006.  Later filings

stated that BLMIS was managing $13.2 billion at the end of 2006, and $17.1 billion at the end of

2007.  Defendants, therefore, knew or should have known that BLMIS was purporting to move

well over $11 billion into and out of the market over the course of a few days, a few times a year.

63.     Upon information and belief, Defendants did not ever conduct independent, reasonable due diligence as to how Madoff was able to perform such extraordinary trading volumes without any impact on the price of the securities he bought and sold.

64.     The sale of over $11 billion of stocks over three or four days would decrease the price of those stocks and thereby cut into Madoff's profits from the sales of such stock. However, no such impact was ever seen, and upon information and belief was not independently or reasonably investigated by the Defendants.

65.     When Madoff exited the market, he claimed to have placed his customers' assets in treasury bills or mutual funds.  The movement of over $11 billion in and out of the market for treasury bills should have affected the price of treasury bills.  This too never happened, and upon information and belief was not independently or reasonably investigated by Defendants.

**8.      The Structure Of BLMIS Was Opaque, Secretive And Lacked Independent Oversight**

**a.      Lack of Checks and Balances**

66.     BLMIS was substantially a family-run business.  Madoff family members controlled almost every key position at the firm, including, critically, that of Chief Compliance Officer, which position was held by Madoff's brother, Peter.  Structured as it was, BLMIS was almost entirely devoid of independent checks and balances.  Madoff himself held positions that would normally be occupied by three separate entities – Madoff was the investment adviser, executing broker and custodian of the assets.  This meant that there was not an independent custodian to assure the proper segregation of a customer's assets, such as Cardinal Management's.

67.     Upon information and belief Defendants knew or should have known that the lack of independent custodying and segregation of assets was a red flag.

**b.     Paper Trading Confirmations Produced Days Later – A Recipe For Fraud**

68.     Despite Madoff's reputation as a pioneer of electronic record-keeping in the market making business, Madoff as a standard practice did not send electronic trade confirmation to clients of his IA Business.  Madoff only provided paper print-outs, which he sent via standard mail.  Instead of receiving real-time electronic access to their accounts and trade information, which was and is customary in the industry for hedge funds and fund of fund investors, BLMIS customers, including Cardinal Management, had to wait several days for their paper trade confirmations to arrive by mail.  Again, upon information and belief, the Defendants performed no inquiry into this red flag.

**c.     The Fact That Madoff's Auditor Was Not Competent To Perform Audits Was A Red Flag Of Fraud Easily Discoverable By Defendants**

69.     BLMIS, which had tens of billions of dollars under management, had audits prepared not by one of the major audit firms, but by Friehling & Horowitz CPAs P.C. ("Friehling"), a one-man firm from Rockland County, New York consisting of a solo accountant, David Friehling, an administrative assistant and a semi-retired CPA living in Florida.

70.     On November 3, 2009, David Friehling pled guilty to seven counts of securities fraud, investment adviser fraud, obstructing or impeding the administration of Internal Revenue Service laws, and making false filings with the SEC.

71.     Upon information and belief, the Defendants accepted Friehling as a bona fide auditor of BLMIS without conducting any meaningful, independent due diligence or inquiry.

72.     Upon information and belief, the Defendants did nothing to independently confirm if Friehling was adequately staffed, technically equipped or professionally capable of performing large scale domestic and international auditing services at a time when Madoff was reporting in excess of $11 billion under management.

73.     The size, lack of qualifications of Friehling, and the nature of the services they provided were readily and publicly accessible to the Defendants.  All accounting firms that perform audit work must enroll in the American Institute of Certified Public Accountants' ("AICPA") peer review program.  This program involves having experienced auditors assess a firm's audit quality each year.  Friehling, while a member of the AICPA, had not been peer reviewed since 1993.  The results of these peer reviews are on public file with the AICPA.  Defendants, as sophisticated investors, therefore, should have discovered that Friehling was not competent to perform audits of BLMIS.

### 9.     Madoff Did Not Charge Standard Asset Management Fees

74.     Madoff's unusual fee structure should have also been a concern to the Defendants.  Madoff charged BLMIS' IA Business customers, such as Cardinal Management, $1 per option contract and $.04 per equity share traded.  The standard investment advisory fee charged by a hedge fund manager ranges from 1% to 2% of assets under management plus a performance fee of 10% to 20% of any profits earned by the investment.  Fees normally run higher for investment advisers with a history of success.  Madoff, however, who appeared to be one of the most successful investment advisers in the world (on a risk-adjusted basis), and contrary to industry standards, agreed to a compensation structure that left hundreds of millions of dollars on the proverbial table, forgoing an estimated $5 million to $12 million per year in fees related to Cardinal Management alone.

75.     The unusual fee structure of BLMIS did give Defendants a powerful incentive to turn a blind eye to the numerous indicia of fraud.  Defendants, whose only role was to funnel money to BLMIS, upon information and belief, received substantial administrative fees and a share of the profits that would normally go to the entity in the position of BLMIS.  This

compensation arrangement, together with the lack of transparency and other factors listed herein,

should have caused an experienced investment professional to investigate BLMIS.

### 10.   Cardinal Management At Times Had A Negative Cash Balance With BLMIS

76.     On a number of occasions, transactions occurred in Cardinal Management's

accounts even when the cash necessary to execute those transactions was not available.  Certain

of these negative balance instances resulted from either the purchase of equities that exceeded the

value of Treasuries sold to fund the purchase, the purchase of put options prior to selling the call

options they were meant to fund, or cash being withdrawn prior to the sale of equities to fund the

redemption.  These extensions of credits by BLMIS were not trivial amounts.  For example, over

a two-day period in January 2006, Cardinal Management had an average negative balance of

more than $4.1 million.  However, Madoff never charged Cardinal Management interest for these

extensions of credit.  In fact, Cardinal Management did not have a margin account with BLMIS

and could not have traded on credit.  Yet, the Defendants, upon information and belief, never

questioned this practice.

### B.   Defendants Were Willing To Ignore Indicia Of BLMIS's Fraud That Others In The Industry Were Not

77.     Many sophisticated individuals, fund managers, diligence firms, consultants and

banks working with information in the public domain, and with far less access than Cardinal

Management and Dakota Global, concluded many years prior to Madoff's arrest that the

consistency of the returns were literally and statistically impossible to achieve and therefore fraud

was likely.

78.     Edward Thorp, "the grandfather of quantitative analysis," concluded over the

course of a single day, as far back as 1991, that Madoff's claimed returns were nearly impossible,

and he was likely a fraud.  All Thorp needed to do was check the number of listed options in the

account of one BLMIS customer against the number of the same options traded on the Chicago

Board Exchange.

79.    Later, in 2001, in response to articles published by MAR/Hedge and Barron's,

Thorp wrote to a fund manager friend expressing serious concerns about Madoff, and about his

friend's fund being invested in BLMIS:

> Just read the Barron's article.  All it does is reinforce my previous
> suspicions.  Do you have access to the "actual" trades done in any
> one account?  If so, can you establish that they could be real?  That
> means checking to see if they are reported on a timely basis, rather
> than substantially delayed, that they are on listed options, that
> those options could have traded at those prices and in the volumes
> reported on the exchanges where the confirms said the trades
> occurred, and ditto with the stocks.
> What if you scale up your representative account to 7bn$.  Could
> the volume of imputed trading in the options markets, in the
> "universe" traded, actually have been done?
> Hope you don't have a major position, or that you are trading on
> "profits."

80.    Thorp explained simple, independent, and reasonable due diligence queries that

Cardinal Management and Dakota Global could have, and should have, undertaken.

81.    As early as 2002, Cambridge Associates consistently recommended that their

clients stay away from Madoff and Madoff-related feeder funds due to lack of transparency, a

fear of front-running the market, and a general inability to understand how the strategy could

produce cash-like, bond-like consistency of returns, in an equity strategy.  In one document,

Cambridge stated that "it felt illegal and that Madoff was not transparent," while also suggesting

that "[i]t might be interesting to compile some historic hedge fund fraud/scams for them to mull

over."

82.    In 2003, a team from Société Génerale's investment bank performed due diligence

on BLMIS and found that BLMIS's numbers did not add up.  Société Génerale then forbade its

investment bank from doing business with BLMIS.  In contrast, Defendants, who had more

visibility into the incredibility of their reported trading activity on their account statements and

their outsized rates of return, continued to do lucrative business with BLMIS until Madoff was

arrested.

83.     In mid-2003, Acorn Partners – a fund of funds and investment adviser for high net

worth individuals – conducted due diligence of Madoff/BLMIS and found it likely that BLMIS's

account statements were generated as part of a fraudulent scheme, and "that fraudulent activity

was highly likely."  Shortly after Madoff was arrested, in a letter to investors, Acorn described

the indicia of fraud that led it to conclude years prior that Madoff was a fraud.  Many of the

reasons given were the red flags noted above.  Indeed, Acorn saw these indicia of fraud as "not

merely warning lights, but a smoking gun."

84.     One of the hedge fund world's best known money managers, James Simons, and

his hedge fund Renaissance Technologies Corp., raised numerous red flags with Madoff in or

around 2003.  While Renaissance had invested a small amount with Madoff in the early 1990s, it

began to increase its own diligence efforts based on, among other things, Madoff's growing

assets under management.   Renaissance analyzed the purported options trading volumes and in

doing so, concluded, among other things, that the volume purportedly being traded, as well as the

lack of identifiable counterparties was extremely suspicious.  Renaissance calculated that if

Madoff did his options trading in one day, he would have been doing 100% of the options trading

for the entire market.

85.     Renaissance also spoke with several market makers in over-the-counter equity

options, none whom claimed to see any significant volume being traded on the days when Madoff

claimed to be executing his options strategy.  Renaissance determined that whoever would have

been willing to trade the basket of options Madoff purportedly was trading would have done so at unfavorable prices. Put simply, Renaissance figured out that Madoff's options trading did not make any sense.

86.    Beyond the options issues, in November 2003, a Renaissance employee also wondered aloud regarding a number of issues concerning Madoff. Regarding Madoff feeder funds — specifically Fairfield Sentry – the employee noted that: "Madoff allows an outside group [Fairfield Greenwich] to make $100 million per year in fees for doing absolutely nothing." The employee went on: "The point is that as we don't know why he does what he does we have no idea if there are conflicts in his business that could come to some regulator's attention. Throw in that his brother-in-law is his auditor and he is also high up in the organization . . . . and you have the risk of some nasty allegations, the freezing of accounts, etc., etc." The employee proposed that "unless we can figure out a way to get comfortable with the regulatory tail risk in a hurry, we get out." Indeed, Renaissance made a decision in November 2003 to redeem all of its BLMIS investments.

87.    Aksia, LLC ("Aksia"), an independent hedge fund research and advisory firm, advised its clients in 2007 against investing with BLMIS, Madoff, or any of his feeder funds because of certain red flags. Simon Fludgate, head of operational due diligence at Aksia, concluded that the stock holdings reported in the quarterly statements BLMIS filed with the SEC appeared too small to support the size of the assets BLMIS claimed to be managing. In September 2007, Aksia prepared an Investment Review of Madoff feeder fund Fairfield Sentry. In that report, Aksia concluded that the fund's description of how returns were generated was implausible. In fact, Aksia's review of Fairfield Sentry led it to conclude that either (a) Madoff's IA account was used to supply capital to Madoff's wholesale market making business, or (b) that

"[t]he Feeder Funds are part of a financial game and the approximately 1.1 billion per year of gross excess returns . . . . do not really exist."

88.     In reaching its conclusion, Aksia found, among other things, that (1) the return stream of Fairfield Sentry did not appear to be possible under the split-strike strategy; (2) Fairfield Sentry's quarterly S.E.C. filings uncovered $0 equity holdings every quarter except for one, even though Aksia was told that Madoff's SSC Strategy sometimes lasts for as long as eight months; (3) the use of the U.S. mail instead of electronic means to provide position and trading execution information was suspicious; (4) based on the amount under management for feeder funds, "the required trade sizes are huge and inconsistent with the size of the S&P 100 options market"; and (5) Madoff chose "to earn a paltry 4 cents a share" when he could have taken a proprietary trading position and earned over one billion dollars.

89.     Cambridge Associates, Société Génerale, Acorn Partners, Renaissance, and Aksia, all determined that something was simply not right with Madoff and either pulled their investments or refused to recommend investments to others through BLMIS.  Cardinal Management and Dakota Global had even more information at their disposal, but failed to conduct reasonable due diligence, and instead, chose to consciously and/or recklessly disregard such information, in favor of their own financial profit.

## THE TRANSFERS

**A.    Transfers From BLMIS To Cardinal Management**

90.     During the two years prior to the Filing Date, BLMIS made transfers to or for the benefit of Cardinal Management totaling $28,789,737 (the "Two Year Transfers," and/or the "Transfers"), under circumstances which should have put Cardinal Management and Dakota Global on notice that the Two Year Transfers were fraudulent.  *See* Exhibit B, column 10.

91.     Cardinal Management was an initial transferee of the avoidable transfers set forth above or the entity for whose benefit the transfer was made.

92.     The Two Year Transfers are avoidable and recoverable under Bankruptcy Code §§ 548, 550(a) and 551, the applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3),  and applicable provisions of DCL §§ 273 – 279.

93.     During the 90 days prior to the Filing Date, BLMIS made payments or other transfers totaling $24,099,820 to or for the benefit of Cardinal Management (the "Preference Period Transfers").  *See* Exhibit B, column 9.

94.     The Preference Period Transfers are avoidable and recoverable under Bankruptcy Code §§ 547, 550(a) and 551 and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

95.     Although Cardinal Management invested more than it withdrew from BLMIS, Cardinal Management is in a more favorable position than the other customers of BLMIS as a result of the over $28 million in Transfers of cash from BLMIS to its account.

**B.     Transfers From Cardinal Management To Dakota Global**

96.     Upon information and belief, Cardinal Management transferred at least $24 million of the avoidable Preference Period Transfers it received from BLMIS to Defendant Dakota Global.  In the alternative, Cardinal Management transferred at least $24 million of the avoidable Two Year Transfers it received from BLMIS to Dakota Global (the "Subsequent Transfers").

97.     The Subsequent Transfers, or the value thereof, are recoverable from Dakota Global pursuant to Bankruptcy Code § 550(a).

98.     The Trustee's investigation is ongoing and the Trustee reserves the right to

(i) supplement the information regarding the Transfers, Subsequent Transfers, and any additional

transfers and (ii) seek recovery of such additional transfers.

99.     To the extent that any of the avoidance and/or recovery counts may be inconsistent

with each other, they are to be treated as being pleaded in the alternative.

## CUSTOMER CLAIMS

100.     On or about July 2, 2009, Cardinal Management filed a customer claim with the

Trustee, which the Trustee has designated as Claim # 14653.  On or about July 2, 2009, Cardinal

Management filed a second customer claim with the Trustee, which the Trustee has designated as

Claim # 15267.  On or about July 7, 2009, Cardinal Management filed a third customer claim

with the Trustee, which the Trustee has designated as Claim # 70152 (all three together, the

"Customer Claims").

101.     On December 23, 2008, this Court entered an Order on Application for Entry of an

Order Approving Form and Manner of Publication and Mailing of Notices, Specifying

Procedures for Filing, Determination and Adjudication of Claims, and Providing Other Relief

("Claims Procedures Order"; Docket No. 12).  The Claims Procedures Order includes a process

for determination and allowance of claims under which the Trustee has been operating.  The

Trustee intends to resolve the Customer Claims, and any related objections to the Trustee's

determination of such claims through a separate hearing as contemplated by the Claims

Procedures Order.

## COUNT ONE
## PREFERENTIAL TRANSFERS (INITIAL TRANSFEREE)
## 11 U.S.C. §§ 547(b), 550(a), AND 551

### *Against Cardinal Management*

102.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

103.    At the time of each of the Preference Period Transfers, Cardinal Management was a "creditor" of BLMIS both within the meaning of Bankruptcy Code § 101(10) and pursuant to SIPA § 78fff-2(c)(3).

104.    Each of the Preference Period Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of Bankruptcy Code § 101(54) and pursuant to SIPA § 78fff-2(c)(3).

105.    Each of the Preference Period Transfers was to or for the benefit of Cardinal Management.

106.    Each of the Preference Period Transfers was made for or on account of an antecedent debt owed by BLMIS before such transfer was made.

107.    Each of the Preference Period Transfers was made while BLMIS was insolvent.

108.    Each of the Preference Period Transfers was made during the preference period under Bankruptcy Code § 547(b)(4).

109.    Each of the Preference Period Transfers enabled Cardinal Management to receive more than Cardinal Management would receive if: (i) this case was a case under chapter 7 of Bankruptcy Code, (ii) the transfers had not been made, and (iii) Cardinal Management received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

110.     Each of the Preference Period Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to Bankruptcy Code § 547(b)(4) and recoverable from Cardinal Management as an initial transferee or the entity for whose benefit such transfers were made pursuant to Bankruptcy Code § 550(a).

111.     As a result of the foregoing, pursuant to Bankruptcy Code §§ 547(b), 550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Cardinal Management: (a) avoiding and preserving the Preference Period Transfers, (b) directing that the Preference Period Transfers be set aside, and (c) recovering the Preference Period Transfers, or the value thereof, from Cardinal Management for the benefit of the estate of BLMIS.

## COUNT TWO
## PREFERENTIAL TRANSFERS (SUBSEQUENT TRANSFEREE)
## 11 U.S.C. §§ 547(b), 550(a) AND 551

### *Against Dakota Global*

112.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

113.     Each of the Preference Period Transfers is avoidable under SIPA § 78fff-2(c)(3) and Bankruptcy Code § 547(b).  Furthermore, each of the Preference Period Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of  Bankruptcy Code § 101(54)and pursuant to SIPA § 78fff-2(c)(3).

114.     Upon information and belief, Cardinal Management transferred at least $24 million of the Preference Period Transfers to Dakota Global.

115.     Upon information and belief, Dakota Global was an immediate or mediate transferee of at least $24 million of the Preference Period Transfers pursuant to Bankruptcy Code § 550(a) (the "Preference Period Subsequent Transfers").

116.    Each of the Preference Period Subsequent Transfers was made directly or indirectly to or for the benefit of Dakota Global.

117.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to Bankruptcy Code §§ 547(b), 550(a), 551, and SIPA § 78fff-2(c)(3), recovering the Preference Period Subsequent Transfers, or the value thereof, from Dakota Global for the benefit of the estate of BLMIS.

**COUNT THREE**
**FRAUDULENT TRANSFERS – 11 U.S.C. §§ 548(a)(1)(A), 550(a), AND 551**

*Against Cardinal Management*

118.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

119.    Each of the Two Year Transfers was made on or within two years before the Filing Date of the BLMIS case.

120.    Each of the Two Year Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of Bankruptcy Code §§ 101(54) and 548(a) and pursuant to SIPA § 78fff-2(c)(3).

121.    Each of the Two Year Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors.  BLMIS made the Two Year Transfers to or for the benefit of the Cardinal Management in furtherance of a fraudulent investment scheme.

122.    Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to Bankruptcy Code § 548(a)(1)(A) and recoverable from Cardinal Management pursuant to Bankruptcy Code § 550(a) and SIPA § 78fff-2(c)(3).

123.    As a result of the foregoing, pursuant to Bankruptcy Code §§ 548(a)(1)(A), 550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from Cardinal Management for the benefit of the estate of BLMIS.

## COUNT FOUR
## FRAUDULENT TRANSFERS – 11 U.S.C. §§ 548(a)(1)(B) , 550(a) AND 551

### *Against Cardinal Management*

124.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

125.    Each of the Two Year Transfers was made on or within two years before the Filing Date.

126.    Each of the Two Year Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of Bankruptcy Code §§ 101(54) and 548(a) and pursuant to SIPA § 78fff-2(c)(3).

127.    BLMIS received less than a reasonably equivalent value in exchange for each of the Two Year Transfers.

128.    At the time of each of the Two Year Transfers, BLMIS was insolvent, or became insolvent as a result of the Two Year Transfers.

129.    At the time of each of the Two Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

130.    At the time of each of the Two Year Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

131.    Each of the Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to Bankruptcy Code § 548(a)(1)(B) and recoverable from Cardinal Management pursuant to Bankruptcy Code § 550(a) and SIPA § 78fff-2(c)(3).

132.    As a result of the foregoing, pursuant to Bankruptcy Code §§ 548(a)(1)(B), 550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Cardinal Management:  (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from Cardinal Management for the benefit of the estate of BLMIS.

**COUNT FIVE**
**FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND CREDITOR LAW
§§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a) AND 551**

***Against Cardinal Management***

133.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

134.    At all times relevant to the Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under the Bankruptcy Code § 502 or that were and are not allowable only under Bankruptcy Code § 502(e).

135.    Each of the Transfers constitutes a conveyance by BLMIS as defined under DCL § 270.

136.    Each of the Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Transfers to or for the benefit of Cardinal Management in furtherance of a fraudulent investment scheme.

137.    Each of the Transfers was received by Cardinal Management with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the transfers and/or future creditors of BLMIS.

138.    As a result of the foregoing, pursuant to DCL §§ 276, 276-a, 278 and/or 279, Bankruptcy Code §§ 544(b), 550(a)(1), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Cardinal Management:  (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside, (c) recovering the Transfers, or the value thereof, from Cardinal Management for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from Cardinal Management.

**COUNT SIX**
**FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND CREDITOR LAW**
**§§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551**

*Against Cardinal Management*

139.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

140.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under Bankruptcy Code § 502 or that were and are not allowable only under Bankruptcy Code § 502(e).

141.    Each of the Transfers constitutes a conveyance by BLMIS as defined under DCL § 270.

142.    BLMIS did not receive fair consideration for the Transfers.

143.    BLMIS was insolvent at the time it made each of the Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Transfers.

144.    As a result of the foregoing, pursuant to DCL §§ 273, 278 and/or 279, Bankruptcy Code §§ 544(b), 550(a), 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Cardinal Management:  (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside, and (c) recovering the Transfers, or the value thereof, from Cardinal Management for the benefit of the estate of BLMIS.

## COUNT SEVEN
## FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

### *Against Cardinal Management*

145.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

146.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under Bankruptcy Code § 502 or that were and are not allowable only under Bankruptcy Code § 502(e).

147.    Each of the Transfers constitutes a conveyance by BLMIS as defined under DCL § 270.

148.    BLMIS did not receive fair consideration for the Transfers.

149.    At the time BLMIS made each of the Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Transfers was an unreasonably small capital.

150.    As a result of the foregoing, pursuant to DCL§§  274, 278 and/or 279, Bankruptcy Code §§ 544(b), 550(a) and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment

against Cardinal Management:  (a) avoiding and preserving the Transfers, (b) directing that the

Transfers be set aside, and (c) recovering the Transfers, or the value thereof, from Cardinal

Management for the benefit of the estate of BLMIS.

**COUNT EIGHT**
**FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND CREDITOR LAW**
**§§ 275, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551**

*Against Cardinal Management*

151.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of the Complaint as if fully rewritten herein.

152.    At all relevant times there was and is at least one or more creditors who held and

hold matured or unmatured unsecured claims against BLMIS that were and are allowable under

Bankruptcy Code § 502 or that were and are not allowable only under Bankruptcy Code § 502(e).

153.    Each of the Transfers constitutes a conveyance by BLMIS as defined under DCL §

270.

154.    BLMIS did not receive fair consideration for the Transfers.

155.    At the time BLMIS made each of the Transfers, BLMIS had incurred, was

intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts

matured.

156.    As a result of the foregoing, pursuant to DCL §§ 275, 278, and/or 279, Bankruptcy

Code §§ 544(b), 550(a), and 551,  and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment

against Cardinal Management:  (a) avoiding and preserving the Transfers, (b) directing that the

Transfers be set aside, and (c) recovering the Transfers, or the value thereof, from Cardinal

Management for the benefit of the estate of BLMIS.

## COUNT NINE
## RECOVERY OF SUBSEQUENT TRANSFERS
## 11 U.S.C. §§ 544, 548, 550(a) AND 551

### *Against Dakota Global*

157.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

158.   Each of the Two Year Transfers are avoidable under Bankruptcy Code §§ 544, 548, and SIPA § 78fff-2(c)(3).

159.   Upon information and belief, Dakota Global received Subsequent Transfers, which are recoverable pursuant to Bankruptcy Code § 550(a).

160.   Each of the Subsequent Transfers was made directly or indirectly to, or for the benefit of, Dakota Global.

161.   Dakota Global is an immediate or mediate transferee of the Subsequent Transfers

162.   As a result of the foregoing, pursuant to Bankruptcy Code § 550(a), and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Dakota Global recovering the Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

## COUNT TEN
## DISALLOWANCE OF CUSTOMER CLAIMS

### *Against Cardinal Management*

163.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

164.   Cardinal Management has filed Customer Claims, as defined above, which have not yet been determined.

165.   Cardinal Management's Customer Claims should not be allowed pursuant to Bankruptcy Code § 502(d), as Cardinal Management which filed the Customer Claims is the

recipient of transfers of BLMIS's property which are avoidable and recoverable under

Bankruptcy Code §§ 544, 547, 548 and/or 550(a), DCL §§ 273-279, and SIPA § 78fff-2(c)(3) as

set forth above, and neither Cardinal Management, nor Dakota Global have returned the Transfers

to the Trustee.

166.    The Claims Procedures Order includes a process for determination and allowance

of claims under which the Trustee has been operating.  As a result of the foregoing, the Trustee

intends to resolve Cardinal Management's Customer Claims, and any related objections through

the mechanisms contemplated by the Claims Procedures Order.

**COUNT ELEVEN**
**EQUITABLE SUBORDINATION OF CUSTOMER CLAIMS**

167.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

168.    Cardinal Management and Dakota Global engaged in inequitable conduct,

including behavior described in this Complaint, that has resulted in injury to the customers and

creditors of the estate and has conferred an unfair advantage on Cardinal Management and

Dakota Global.

169.    Based on Cardinal Management and Dakota Global's inequitable conduct as

described above, the customers of BLMIS have been misled as to the true financial condition of

the debtor, customers have been induced to invest without knowledge of the actual facts

regarding BLMIS's financial condition, and/or customers and creditors are less likely to recover

the full amounts due to them because of the conduct of Cardinal Management and Dakota Global.

170.    The Court should exercise the full extent of its equitable powers to ensure that

claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by

Cardinal Management directly or indirectly against the estate – and only to the extent such claims

are allowed – are subordinated for distribution purposes pursuant to Bankruptcy Code §§
510(c)(1) and 105(a).

171.    Equitable subordination as requested herein is consistent with the provisions and
purposes of the Bankruptcy Code.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor
of the Trustee and against Defendants as follows:

i.    On the First Claim for Relief, pursuant to §§ 547(b), 550(a) and 551 of the
Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding
and preserving the Preference Period Transfers, (b) directing that the Preference Period Transfers
be set aside, and (c) recovering the Preference Period Transfers, or the value thereof, from
Cardinal Management for the benefit of the estate of BLMIS;

ii.    On the Second Claim for Relief, pursuant to §§ 547(b), 550(a) and 551 of the
Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment recovering the
Preference Period Subsequent Transfers, or the value thereof, from Dakota Global for the benefit
of the estate of BLMIS;

iii.    On the Third Claim for Relief, pursuant to §§ 548(a)(1)(A), 550(a), and 551 of the
Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding
and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside,
and (c) recovering the Two Year Transfers, or the value thereof, from Cardinal Management for
the benefit of the estate of BLMIS;

iv.    On the Fourth Claim for Relief, pursuant to §§ 548(a)(1)(B), 550(a), and 551 of
the Bankruptcy Code, SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding
and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside,

and (c) recovering the Two Year Transfers, or the value thereof, from Cardinal Management for the benefit of the estate of BLMIS;

v.          On the Fifth Claim for Relief, pursuant to New York Debtor and Creditor Law §§ 276, 276-a, 278 and/or 279, Bankruptcy Code §§ 544(b), 550(a), and 551, and SIPA § 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against Cardinal Management:  (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside, (c) recovering the Transfers, or the value thereof, from Cardinal Management for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from Cardinal Management;

vi.          On the Sixth Claim for Relief, pursuant to New York Debtor and Creditor Law §§ 273, 278 and/or 279, Bankruptcy Code §§ 544(b), 550(a), 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Cardinal Management:  (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside, and (c) recovering Transfers, or the value thereof, from Cardinal Management for the benefit of the estate of BLMIS;

vii.          On the Seventh Claim for Relief, pursuant to New York Debtor and Creditor Law §§ 274, 278 and/or 279, Bankruptcy Code §§ 544(b), 550(a), and 551,  and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Cardinal Management:  (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside, and (c) recovering the Transfers, or the value thereof, from Cardinal Management for the benefit of the estate of BLMIS;

viii.          On the Eighth Claim for Relief, pursuant to New York Debtor and Creditor Law §§ 275, 278 and/or 279, Bankruptcy Code §§ 544(b), 550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Cardinal Management:  (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside, and (c) recovering the Transfers, or the value thereof, from Cardinal Management for the benefit of the estate of BLMIS;

ix.        On the Ninth Claim for Relief, pursuant to Bankruptcy Code § 550(a), and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Dakota Global recovering the Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS;

x.        On the Tenth Claim for relief, pursuant to Bankruptcy Code § 502(d), the Trustee is entitled to a judgment that the SIPA Customer Claims filed by Cardinal Management be disallowed;

xi.        On the Eleventh Claim for Relief, to the extent the SIPA Customer Claims filed by Cardinal Management are allowed, the Trustee is entitled to a judgment that such claims shall be subordinated for distribution purposes pursuant to Bankruptcy Code §§ 510(c)(1) and 105(a);

xii.        On all Claims for Relief, the Trustee is entitled to a judgment, pursuant to federal common law and NY CPLR 5001, and 5004, awarding the Trustee prejudgment interest from the date on which the Transfers were received;

xiii.        On all Claims for Relief, the Trustee is entitled to establishment of a constructive trust over the proceeds of the Transfers to the Defendants in favor of the Trustee for the benefit of BLMIS's estate;

xiv.        On all Claims for Relief, the Trustee is entitled to assignment of Defendant Cardinal Management's rights to seek refunds from the government for federal, state, and local taxes paid on Fictitious Profits during the course of the scheme;

xv.        Awarding the Trustee all applicable interest, costs, and disbursements of this action; and

xvi.        Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

(signature block on next page)

Dated: New York, New York
        November 24, 2010

*/s/ David J. Sheehan;*
*/s/ Keith R. Murphy;*
*/s/ Marc Skapof*
Baker & Hostetler LLP
45 Rockefeller Cardinal Management
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Keith R. Murphy
Email: kmurphy@bakerlaw.com
Marc Skapof
Email: mskapof@bakerlaw.com

-- and –

Baker & Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 861-1500
Facsimile: (202) 861-1783
Elizabeth A. Scully (*pro hac*)
Email: escully@bakerlaw.com

*Attorneys for Irving H. Picard,*
*Trustee for the SIPA Liquidation of Bernard L.*
*Madoff Investment Securities LLC*